IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| METROPCS WIRELESS, INC., | § | |
| | § | |
| Plaintiff- | § | |
| counterdefendant, | § | |
| | § | Civil Action No. 3:08-CV-1658-D |
| VS. | § | |
| | § | |
| VIRGIN MOBILE USA, L.P., | § | |
| | § | |
| Defendant- | § | |
| counterplaintiff. | § | |

MEMORANDUM OPINION
AND ORDER

This is a lawsuit in which plaintiff-counterdefendant MetroPCS Wireless, Inc. ("MetroPCS") and defendant-counterplaintiff Virgin Mobile USA, L.P. ("Virgin Mobile") assert claims and counterclaims arising under federal and state law related to a dispute about MetroPCS' reflashing service, in which it reconfigures mobile handsets (cell phones) of other wireless service providers (including Virgin Mobile) to operate on MetroPCS' wireless network. Both parties move for partial summary judgment. For the reasons that follow, the court grants in part and denies in part both motions.

I

MetroPCS is a wireless telecommunications provider that offers wireless services primarily over its own network.[1]  Customers pay

_____

[1]As the court has stated in cases like *AMX Corp. v. Pilote Films*,

[b]ecause both parties have filed motions for

a flat fee for unlimited use during a given month, without a long-term contract.  Virgin Mobile, a competitor of MetroPCS, provides wireless telecommunications service via the digital nationwide facilities of Sprint Nextel Corp. (the "Virgin Mobile Service").  Virgin Mobile sells so-called "pay-as-you-go" plans that are marketed to customers (such as those with low income or poor credit) who might not be able to afford longer term contracts.  Customers make advance purchases of airtime to be used on the Virgin Mobile Service, and they only pay for minutes they use.  They access this service using handsets that Virgin Mobile sells and that bear the Virgin Mobile trademark "VIRGIN MOBILE" on their face and the VIRGIN MOBILE logo on the electronic display.  These handsets also contain proprietary software that enables the handset to send and receive calls on the Virgin Mobile Service.  The software also enables customers to access other features, such as downloadable ringtones, graphics, and other content.

---

summary judgment, the court will principally recount only the evidence that is undisputed. If it is necessary to set out evidence that is contested, the court will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  In this way it will comply with the standard that governs resolution of summary judgment motions.

*AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5) (Fitzwater, J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)), *modified in part on other grounds*, 2007 WL 2254943 (N.D. Tex. Aug. 7, 2007) (Fitzwater, J.).

To attract potential customers (many of whom have low income and/or poor credit), Virgin Mobile sells its Virgin Mobile-branded handsets well below cost and market value. Virgin Mobile maintains that its sales practices are only economically feasible if it can recover its losses over time through the sale of airtime. If a customer purchases a Virgin Mobile-branded handset at an artificially low price and then reflashes the handset for service on a competitor's network, Virgin Mobile suffers financially. To protect its investment, recover the financial loss involved ($50 or more per handset), and obtain the economic advantage that it expects from its below-cost handset pricing policy, Virgin Mobile sells handsets that are manufactured with separate software and security measures that control access to its proprietary software and are designed to prevent alteration of that software and/or of the handset. It also sells each handset subject to terms and conditions——contained on product packaging[2] and in a "Terms of Service" booklet located inside the product packaging and on its

_____

[2]The product packaging contains the following:

> THIS PHONE IS SOLD EXCLUSIVELY FOR USE WITH SERVICE THAT VIRGIN MOBILE USA PROVIDES. COMMERCIAL RESALE PROHIBITED EXCEPT BY AUTHORIZED VIRGIN MOBILE USA DEALERS. YOU MAY NOT ALTER ANY OF THE HARDWARE OR SOFTWARE IN THIS PHONE, OR EXPORT THIS PHONE FROM THE USA. BY PURCHASING THIS PHONE OR OPENING THIS PACKAGE, YOU ARE AGREEING TO THESE TERMS.

D. App. 144.

website[3]——prohibiting alteration of the handset's hardware or software and use of the handset on any other company's wireless network.

The instant litigation involves MetroPCS' MetroFLASH service, which it introduced in June 2008. MetroFLASH enables owners of certain non-MetroPCS compatible code division multiple access handsets ("CDMA") to arrange for their phones to be "unlocked" or "reflashed" so that they receive wireless service solely from MetroPCS. The MetroFLASH service uses a software program to change values in the memory of the handsets. MetroPCS reflashes handsets only at a handset owner's request and only when a customer establishes wireless service with MetroPCS and agrees to various terms.[4]

---

[3]The "Terms of Service" booklet states, in part, on the first page:

> Virgin Mobile USA, LP's Terms of Service apply to the phones we sell and services we offer to our customers. By purchasing, activating or using a Virgin Mobile phone, you agree to these Terms of Service . . . . You agree not to use Virgin Mobile services in any way that is illegal, fraudulent or abusive, as determined by Virgin Mobile in its sole discretion. You may not alter any of the hardware or software on your Virgin Mobile phone. Virgin Mobile phones may not be purchased in bulk and sold to third parties.

*Id.* at 146.

[4]MetroPCS alleges that prospective customers must read and sign several terms, including that (1) the unlocked handset will use a network other than that of the provider whose trademarks

- 4 -

Virgin Mobile maintains that, when MetroPCS induces Virgin Mobile customers to switch from Virgin Mobile to MetroPCS and, through the MetroFLASH service, to alter their Virgin Mobile-branded handsets for use on the MetroPCS network, MetroPCS infringes (directly and contributorily) and dilutes Virgin Mobile's trademarks and tortiously interferes with its existing contracts with existing and prospective customers. Virgin Mobile's trademark infringement counterclaims are based on the fact that, after Virgin Mobile-branded handsets are reflashed to operate on the MetroPCS network, they still bear Virgin Mobile's trademarks. Virgin Mobile complains that reflashing allows MetroPCS to free-ride on Virgin Mobile's effort and investment in developing, marketing, and distributing its wireless products and services, prevents Virgin Mobile from recouping its financial losses from below-cost sales of handsets, can lead to decreased functionality of handsets, and can damage handsets.

Virgin Mobile notified MetroPCS of its contention that MetroFLASH infringed Virgin Mobile's marks and that MetroPCS was thereby tortiously interfering with Virgin Mobile's contracts, and

---

appear on the handset, (2) they may experience different coverage with MetroPCS' service, and (3) the unlocked handset will support only voice service and text messaging. MetroPCS also asserts that customers requesting the reflashing service must affirm that they (1) do not have a contract with any other wireless service provider, (2) are not participating in a scheme to acquire bulk quantities of subsidized handsets to resell at higher prices, and (3) will not use the original provider's trademarks in selling, offering for sale, distributing, or advertising their handsets.

it demanded that MetroPCS cease and desist reflashing Virgin Mobile-branded handsets. After an exchange of letters in which Virgin Mobile persisted in its cease-and-desist demand, MetroPCS filed the instant lawsuit. MetroPCS seeks a declaratory judgment that it is not committing federal trademark infringement under 15 U.S.C. § 1114 (count one) or trademark dilution (count two); that Virgin Mobile's customer agreements are preempted by the Digital Millennium Copyright Act ("DMCA") exemption (count three); and that MetroPCS is not tortiously interfering with Virgin Mobile's contractual relations (count four) or prospective business relations (count five). Virgin Mobile counterclaims for tortious interference with existing contracts (counterclaim one)[5] and with prospective business relations (counterclaim two); direct and contributory trademark infringement under 15 U.S.C. § 1114 (counterclaim three); and trademark dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (counterclaim four).

MetroPCS moves for partial summary judgment on the parties' respective trademark claims (counts one and two of MetroPCS's complaint and counterclaims three and four of Virgin Mobile's counterclaim).[6] Virgin Mobile moves for partial summary judgment

---

[5]Virgin Mobile refers to its counterclaims by the ordinal numbers "first," etcetera. The court, for ease of reference, will refer to them by the cardinal numbers "one," etcetera.

[6]In its brief, MetroPCS requests that the court hear oral argument. This request is denied. *See* N.D. Tex. Civ. R. 7.1(g).

on counterclaim one and counts three, four, and five.  Both parties

move  for  partial  summary  judgment  after  having  conducted  only

limited  discovery.    Nevertheless,  the  court  concludes  that  the

record is sufficient to support its summary judgment rulings, which

largely deny the parties' motions.

II

When  a  summary  judgment  movant  will  not  have  the  burden  of

proof on a claim or counterclaim at trial, it need only point the

court  to  the  absence  of  evidence  of  any  essential  element  of  the

opposing  party's  claim  or  defense.    *See Celotex Corp. v. Catrett,*

477 U.S. 317, 323 (1986).  Once it does so, the nonmovant must go

beyond  its  pleadings  and  designate  specific  facts  demonstrating

that there is a genuine issue for trial.  *See id.* at 324; *Little v.*

*Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per

curiam).    An  issue  is  genuine  if  the  evidence  is  such  that  a

reasonable jury could return a verdict for the nonmovant.  *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The nonmovant's

failure  to  produce  proof  as  to  any  essential  element  renders  all

other  facts  immaterial.    *Trugreen Landcare, L.L.C. v. Scott,* 512

F.Supp.2d  613,  623  (N.D.  Tex.  2007)  (Fitzwater,  J.).    Summary

judgment is mandatory where the nonmoving party fails to meet this

burden.  *Little,* 37 F.3d at 1076.

III

The court first considers MetroPCS' contention that it is entitled to summary judgment dismissing Virgin Mobile's direct trademark infringement counterclaim (counterclaim three).[7]

The Lanham Act provides a cause of action for trademark infringement against one who "uses (1) any reproduction, counterfeit, copy[,] or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, distribution[,] or advertising of any goods; (5) where such use is likely to cause confusion or to cause mistake or to deceive." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008) (brackets in original; internal quotation marks and citation omitted); *see* 15 U.S.C. § 1114(1)(a). MetroPCS maintains that it is entitled to summary judgment dismissing Virgin Mobile's direct infringement counterclaim because Virgin Mobile cannot establish either that MetroPCS "used" the Virgin Mobile mark "in commerce" or that its alleged use is likely to cause confusion.

IV

The court considers initially whether a reasonable trier of fact could find that MetroPCS' MetroFLASH service constitutes "use in commerce" of the Virgin Mobile mark.

---

[7]The court addresses the contributory infringement component of Virgin Mobile's counterclaim three *infra* at § VIII.

- 8 -

A

Before turning to the specific issue of "use" under the Lanham Act, it is helpful to outline the two essential functions of trademark law.

First, trademark law aids consumers by assuring that products with the same trademark come from the same source. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64 (1995) (observing that trademark law, "by preventing others from copying a source-identifying mark, reduce[s] the customer's costs of shopping and making purchasing decisions, for it quickly and easily assures a potential customer that *this* item——the item with this mark——is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past") (internal citation and quotation marks omitted) (emphasis in original).  Second, trademark law protects the economic investments of the trademark owner.  The law assures a producer "that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.* at 164.  A trademark can serve these two purposes, however, only to the extent that it distinguishes a producer's goods.  *See id.* (observing that "the source-distinguishing ability of a mark . . . permits it to serve these basic purposes" of trademark law).  It is therefore apparent that the primary function of a trademark is to serve as a label——a mark that identifies and distinguishes a particular product.

B

In the context of altering a trademarked good, which both
parties agree is the relevant context here, two additional
principles emerge from the case law.

First, at least in the context of the *sale* of repaired or
altered goods that still bear their original trademark, if it is
deceptive to retain the trademark because the product is, after
extensive repairs or alterations, essentially a new product, then
the original trademark must be removed from the repaired or altered
good. *See Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 129
(1947) ("Cases may be imagined where the reconditioning or repair
would be so extensive or so basic that it would be a misnomer to
call the article by its original name[.]").

> A trade-mark only gives the right to prohibit
> the use of it so far as to protect the owner's
> good will against the sale of another's
> product as his . . . . When the mark is used
> in a way that does not deceive the public
> [there is] no such sanctity in the word as to
> prevent its being used to tell the truth.

*Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368 (1924).  Thus where
the repair or alteration is not so substantial as to create a new
product, it is not deceptive for the product, which essentially
remains the same, to retain its original mark, so long as it is
clearly and distinctly sold as repaired or reconditioned rather
than as new.  *See Champion Spark Plug Co.*, 331 U.S. at 128 ("We are
dealing here with second-hand goods.  The spark plugs, though used,

are nevertheless Champion plugs and not those of another make.");
*Coty*, 264 U.S. at 366-67, 369 (Where the defendant "buys the
genuine perfume in bottles and sells it in smaller bottles," "we
see no reason why [the original trademark] should not be used
collaterally, not to indicate the goods, but to say that the trade-
marked product is a constituent in the article now offered as new
and changed.").

     Second, courts are reluctant to extend the Lanham Act's scope
to cases where a trademarked product is repaired, rebuilt, or
modified at the request of the product's owner. *See, e.g., Karl
Storz Endoscopy-Am., Inc. v. Fiber Tech Med., Inc.*, 4 Fed. Appx.
128, 132 (4th Cir. 2001) (per curiam) (discussing cases); *Cartier
v. Symbolix, Inc.*, 454 F.Supp.2d 175, 185 (S.D.N.Y. 2006)
(concluding that the overall transaction, in which defendants added
diamonds and polished a stainless steel Tank Francaise watch at the
request of a customer who had previously purchased the watch, did
not constitute "use in commerce" within the meaning of the Lanham
Act); *U.S. Surgical Corp. v. Orris, Inc.*, 5 F.Supp.2d 1201, 1209
(D. Kan. 1998) (holding that where defendant reprocessed
trademarked instruments by cleaning, re-sterilizing, and
resharpening them, "such conduct does not constitute use of
[plaintiff's] trademarks").   Although not always clearly
articulated, the reason appears to lie in the "use" requirement for
trademark infringement.

> "[U]se in commerce" appears to contemplate a
> trading upon the goodwill of or association
> with the trademark holder.  Therefore, a mere
> repair of a trademarked good, followed by
> return of the good to the same owner who
> requested the repair or rebuild, does not
> constitute a "use in commerce" of the
> trademark under the Lanham Act.

*Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d
848, 855 (9th Cir. 2002).  In resale cases, where the defendant
reconditions a product and then resells it with the original
trademark on it, "the defendant uses the trademark not in its
actual repair of the product, but in its sale of the item because
consumers rely on the trademark and the quality it represents."
*U.S. Surgical Corp.,* 5 F.Supp.2d at 1208.  For example, a consumer
purchasing a used spark plug bearing a particular trademark would
believe that the spark plug, although used, was nonetheless a
product of the trademark owner and would make a purchasing decision
accordingly.  But because, in the context of a mere repair
performed at the request of the good's owner, the owner is not
relying on the trademark and the quality it represents, the
defendant is not "using" the trademark in performing the repair.
This reasoning does not extend, however, to owner-requested repairs
where "the trademarked product is so altered that the substance of
the transaction is a sale, and it would be misleading to sell the
product without noting the alterations."  *Karl Storz Endoscopy-Am.,*
285 F.3d at 856.  In such circumstances, the defendant presumably
"uses" the trademark because he is effectively selling a new

- 12 -

product under the original trademark to a purchaser (and/or user) who believes he is paying for (and/or using) a repaired good that is of the same make as that which is represented by the trademark. *See id.*

C

Whether MetroPCS's MetroFLASH service constitutes "use" of the Virgin Mobile trademark under the Lanham Act therefore pivots on the extent to which MetroFLASH alters a Virgin Mobile-branded handset. MetroPCS characterizes MetroFLASH——which uses a software program to reflash a handset by resetting certain values in the handset's internal memory, P. 2-3-09 App. 3——as a mere alteration of the handset at the owner's request in connection with establishing service with MetroPCS. MetroPCS posits that it does not completely rebuild any Virgin Mobile-marked handsets, and it does not use any Virgin Mobile marks in any advertisement or suggest in any way an affiliation or endorsement by Virgin Mobile.

Virgin Mobile responds that, through reflashing, MetroPCS effectively creates an entirely new product by causing a handset, whose core function is to operate on the Virgin Mobile Service, to operate only on the MetroPCS wireless network. Virgin Mobile also argues that the fact that MetroPCS recognizes that handsets may be damaged or rendered inoperable by reflashing undercuts MetroPCS' contention that it is merely repairing or making *de minimis* alterations to Virgin Mobile handsets.

- 13 -

The case law provides little guidance on whether the reflashing of a handset transforms it into a new product. Although supporting the general principle that the fundamental alteration of a trademarked product constitutes a "use in commerce" under the Lanham Act, the cases apply the principle in contexts very different from the one involved here. *See, e.g., Karl Storz Endoscopy-Am.*, 285 F.3d at 856 (holding that a reasonable jury could find that an endoscope was fundamentally transformed when every important part, including "the long shaft which is inserted into the patient's body cavity, the light post which focuses the light, the optic fibers that carry the light, the various lenses that magnify and focus the image, [and] the eyepiece through which the surgeon looks," is replaced); *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 709-10 (9th Cir. 1999) (holding that watch was fundamentally transformed where defendant refurbished and replaced "necessary and integral" parts of watch, including the bezel, which "serve[d] a waterproofing function," bracelet, which "a watch cannot be worn without," and dial, which "the watch cannot serve its purpose of timekeeping without.") (citing *Rolex Watch U.S.A., Inc. v. Meece*, 158 F.3d 816, 825 (5th Cir. 1998)).

MetroPCS presents evidence indicating that industry practice treats a handset as separate and distinct from the wireless service on which it operates. Specifically, MetroPCS proffers Virgin Mobile's statement to the U.S. Copyright Office that "more unlocked

handsets are available now than in 2006 due to changes in industry
practice which permit users to reuse their handsets on other
carriers' networks after fairly carrying out their contractual
obligations.  For example, Sprint Nextel unlocks handsets after a
customer's Sprint contract expires." P. 3-30-09 App. 40.  MetroPCS
offers evidence of Virgin Mobile's understanding that "a number of
other carriers, especially those who provide wireless service under
post-paid plans (i.e., with contractual term commitments), now may
provide unsecured handsets upon purchase, offer to unlock handsets
they have sold to such customers[,] or provide information for such
customers to unlock the handsets themselves." *Id.* at 24-25.  And
MetroPCS submits proof of contractual terms from various wireless
service providers that allow unlocking handsets under certain
conditions.  *See id.* at 61 (Virgin Mobile) (Pay As You Go and Pay
by Direct Debit) (contractual terms providing that customers may
unlock handset for fee); 68 (Virgin Mobile) (Pay Monthly Contract)
(contractual terms providing that customers may unlock handset for
fee); 98 (Sprint) (providing Internet website and toll-free
telephone number contacts for obtaining information and eligibility
requirements for software program lock code for CDMA Sprint PCS
phone); 106 (T-Mobile) ("A T-Mobile Device is designed to be used
only with T-Mobile service; however, you may be eligible to have
your Device reprogrammed to work with another carrier but you must
contact us to do so."); 113 (Verizon Wireless) (providing the

default service programming code information for persons who purchased certain wireless phones from Verizon Wireless and who want to reprogram phones for use with other wireless carrier networks).

The evidence MetroPCS submits also indicates, however, that handsets, while conceptually distinct from the wireless service on which they operate, are nonetheless typically linked to a wireless service provider, and that the industry default is to lock a handset to a particular network. *See id.* at 61 (Virgin Mobile) ("Handsets that are used to access our Services are locked to the Network."); 68 (same); 98 (Sprint) ("Your Device is designed to be activated on the Sprint network and in other coverage areas we make available to you. As programmed, it will not accept wireless service from another carrier."); 106 (T-Mobile) ("A T-Mobile Device is designed to be used only with T-Mobile service[.]"). Furthermore, the evidence suggests that, for prepaid handsets, the link between a handset and its service is even firmer. In the full context of Virgin Mobile's comment to the U.S. Copyright Office, Virgin Mobile stated:

> Wireless service providers who use post-payment plans [i.e. with contractual term commitments] necessarily have more flexibility in whether and when to unlock various handsets; if a customer elects a longer term contractual plan, these providers can adjust the subsidy applied for the handset. For example, a traditional post-paid carrier may be able to offer an unsecured device at two different prices with and without a two-year

> contract——i.e., free and at a cost that
> reflects the provider's costs and includes a
> profit margin. On the other hand, while
> Virgin Mobile does offer more traditional
> post-payment plans, a majority of Virgin
> Mobile's customers use its services and its
> subsidized handsets without a long-term
> commitment through the pre-payment model.
> Unlike carriers working in the post-payment
> market who have this built-in ability to adapt
> locking and pricing schemes depending on what
> plan the customer selects, handset locks allow
> Virgin Mobile to continue providing subsidized
> handsets for use with the pre-payment plan.

*Id.* at 25-26. Consequently, considering the summary judgment evidence of industry practice, it is unclear whether reflashing a handset materially alters a handset so as to create a new product.

Besides industry practice, MetroPCS points to common sense, contending that Virgin Mobile's assertion that the wireless service is the essence of the handset device is incongruous with the common sense understanding that an electronic device is distinct from the service it is configured to use. MetroPCS offers as an analogy the television set. According to MetroPCS, if a television set owner replaces satellite service with cable service and reconfigures the television's software to receive the cable signal, it is unreasonable to argue on this basis alone that a new television set has been created. MetroPCS therefore maintains that reflashing a handset to work on another wireless service does not create a new product.

The court concludes that MetroPCS' reliance on this reasoning is misplaced because——due to restrictions imposed by the current

market place——handsets are not analogous to televisions.

> When people buy a television, they think, this is my television, I own it.  If I want to move to broadcast, fine.  If I want to move to cable, fine, satellite, fine.  This is my property, I can do with it what I want. Telephones are nothing like that.

> Over 90 percent of [handset] retail is controlled by the four carriers.  You can't go to any old store and buy a cell phone.  Most of it goes through the bottleneck of the carriers and devices the carriers think are the right phones for Americans.  This is a very unusual situation, and moreover, when you buy these phones, there are two things that tend to happen.  First of all, they tend to be locked to the particular network you buy them from, one way or another; and second of all, it can be very difficult and very complicated to bring your phone with you when you leave one service and move to another service.

*Wireless Innovation and Consumer Protection: Hearing Before the Subcomm. on Telecomm. and the Internet of the H. Comm. on Energy and Commerce*, 110th Cong. 40 (2007) (statement of Professor Timothy Wu).  Therefore, the court cannot say as a matter of law that reflashing does not create a new product.

In summary, the court holds that the summary judgment evidence creates a genuine issue of material fact whether reflashing fundamentally transforms a handset so as to create a new product and therefore constitutes "use" of Virgin Mobile's mark.

V

The court now considers whether a reasonable jury could find that MetroPCS's alleged use of Virgin Mobile's mark creates a likelihood of confusion.

A

The likelihood of confusion test inquires whether the defendant's use of the plaintiff's trademark would likely create confusion in the minds of potential buyers as to the source, affiliation, or sponsorship of the parties' products. *Oreck Corp. v. U.S. Floor Sys., Inc.,* 803 F.2d 166, 170 (5th Cir. 1986). The test is *likelihood* of confusion. Therefore, evidence of actual confusion is not necessary, *id.* at 173, notwithstanding that evidence of such confusion is the best evidence of likelihood of confusion, *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir. 1980). Likelihood of confusion is determined in the context of the typical purchaser of the product in question. *Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 500 n.5 (5th Cir. 1979).

In this circuit, the determination of likelihood of confusion has traditionally turned upon consideration of certain factors. These were known in earlier cases as seven "digits-of-confusion," *see Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 430 (5th Cir. 1984); *B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1262 (5th Cir. 1971) ("we think of this case as a series of digits

to be added together"), and have now evolved into these eight factors: (1) strength of the plaintiff's mark, (2) similarity of design between the marks, (3) similarity of the products, (4) identity of retail outlets and purchasers, (5) similarity of advertising media used, (6) the defendant's intent, (7) actual confusion, and (8) the degree of care exercised by potential purchasers. *Oreck Corp.*, 803 F.2d at 170. In addition, in *Brandtjen & Kluge, Inc. v. Prudhomme*, 765 F. Supp. 1551 (N.D. Tex. 1991) (Fitzwater, J.), this court added three factors that can be applied when one sells an altered product that retains the trademark of the original manufacturer. These factors are: (9) the extent and nature of changes made to the product, (10) the clarity and distinctiveness of the labeling on the reconditioned product, and (11) the degree to which any inferior qualities associated with the reconditioned product would likely be identified by the typical purchaser with the manufacturer. *Id*. at 1567.[8] The elements are recognized in this circuit as being non-exclusive. *See, e.g., Conan Props., Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 149 (5th Cir. 1985). No one factor is dispositive, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved. *Marathon Mfg. Co. v.*

---

[8]The court derived these additional factors from *Coty*, 264 U.S. 359, and *Champion Spark Plug Co.*, 331 U.S. 125, which addressed remedies in trademark infringement cases involving altered products.

*Enerlite Prods. Corp.,* 767 F.2d 214, 218 (5th Cir. 1985) (per curiam).  The party suing for infringement need not support a claim by a majority of the factors.  *Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1159 (5th Cir. 1982).  While likelihood of confusion is typically a question of fact, summary judgment is proper if the "record compels the conclusion that the movant is entitled to judgment as a matter of law." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.,* 550 F.3d 465, 474 (5th Cir. 2008).

B

There are two theories of confusion at issue here: post-sale confusion and initial interest confusion.[9]  Post-sale confusion occurs when someone other than the purchaser encounters the product in some capacity and is confused as to the product's source, affiliation, or sponsorship.  *See, e.g., Neles-Jamesbury, Inc. v. Valve Dynamics, Inc.,* 974 F. Supp. 964, 978 (S.D. Tex. 1997) ("'[L]ikelihood of confusion . . . can be at any point in the chain of distribution or ownership, including post-sale confusion of third parties who later encounter the product.'" (quoting *Joy Mfg. Co. v. CGM Valve & Gauge Co.,* 703 F. Supp. 1387, 1394 (S.D. Tex. 1989))); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

---

[9]MetroPCS contends that Virgin Mobile can prove no point-of-sale confusion because MetroPCS conspicuously and unequivocally informs MetroFLASH customers that their reflashed handsets are configured to work on MetroPCS' network; Virgin Mobile does not argue to the contrary.

*Competition*, § 23:5 (4th ed. 2009) ("The vast majority of courts recognize post-sale confusion, which may occur among those who see an infringing mark in use by . . . owner[s] who were not confused at the time they bought the product."). Trademark infringement can also be based on "confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998) (internal quotation marks and citation omitted).

MetroPCS argues that Virgin Mobile cannot prove likelihood of confusion under either theory. Virgin Mobile contends that consumers who encounter the reflashed handsets——whether by observing others' use of the handsets, using the handsets themselves, or purchasing reflashed handsets in the secondary market——are likely to be confused as to the association of the handsets and service with Virgin Mobile and to mistakenly believe that the decreased functionality of the handsets is attributed to Virgin Mobile. Virgin Mobile posits that, even if purchasers of reflashed handsets in the secondary market eventually learn, prior to purchase, that the trademark holder is unaffiliated with MetroPCS or its MetroFLASH service, MetroPCS still benefits from the initial interest confusion engendered by the association of MetroPCS with the trademark holder. Because the court concludes below that there is a genuine dispute of fact regarding whether

there is a likelihood of post-sale confusion, the court need not consider whether there is a likelihood of initial interest confusion.

VI

The court now analyzes the digits of confusion.

A

Digits one and two—strength of Virgin Mobile's trademark and similarity of design—are of little value here where the essence of the action is that MetroPCS is retaining Virgin Mobile's mark on an altered Virgin Mobile-branded product. *See Brandtjen & Kluge, Inc.*, 765 F. Supp. at 1567 (Where "[t]he essence of [the] action is that the rebuilder is selling under the manufacturer's trademark a rebuilt product of the manufacturer's original making," "[d]igits one and two offer little guidance."). It is undisputed at this point that the Virgin Mobile trademark is an arbitrary mark entitled to greatest protection, that MetroPCS does not remove the trademark from the branded handsets that it reflashes, and that MetroPCS does not provide any indication on the handsets that they have been unlocked and reflashed onto MetroPCS' wireless network.

B

Regarding the fourth and fifth digits—identity of retail outlets and purchasers and similarity of advertising media used—Virgin Mobile offers evidence that would permit a reasonable jury to find likelihood of confusion by the typical purchaser.

Generally, "[d]issimilarities between the retail outlets for and the predominant consumers of [a plaintiff's and a defendant's respective] goods lessen the possibility of confusion, mistake, or deception." *Am. Century Proprietary Holdings, Inc. v. Am. Century Cas. Co.*, 295 Fed. Appx. 630, 637 (5th Cir. 2008) (per curiam) (internal quotation marks omitted; second brackets in original). And "the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *Id.* (internal quotation marks and citation omitted). Virgin Mobile submits unrefuted evidence that MetroPCS and Virgin Mobile both target their wireless services and products to consumers who tend to be lower income and lack strong credit, *see* D. App. 136, and both companies advertise and market through similar media, including selling products over the Internet, *see id.* at 6, 127-28, 137, 159-76.

C

The sixth factor examines MetroPCS' intent. Intent to pass off one's goods as those of another can provide compelling evidence of likelihood of confusion. *See Oreck Corp.*, 803 F.2d at 173. A reasonable jury could not find that MetroPCS retains Virgin Mobile's mark on handsets reflashed through the MetroFLASH service with the intent of deriving benefit from Virgin Mobile's reputation. Therefore, this factor does not support a finding of likelihood of confusion.

- 24 -

D

The seventh factor is actual confusion.  Although evidence of actual confusion is not necessary to demonstrate likelihood of confusion, *Amstar Corp.*, 615 F.2d at 263, because actual confusion is "patently the best evidence of likelihood of confusion," *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 (5th Cir. 1984) (quoting *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 704 (5th Cir. Unit A 1981)), it is probative of the absence of likelihood of confusion if the plaintiff fails to introduce evidence of even one instance in which a typical purchaser was confused, *Brandtjen & Kluge, Inc.*, 765 F. Supp. at 1568.  To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion, or consumer surveys. *Scott Fetzer Co. v. House of Vaccums Inc.*, 381 F.3d 477, 486 (5th Cir. 2004) (citing cases).

Virgin Mobile submits online sale listings in which owners of unlocked or reflashed handsets advertise the sale of their handsets in a manner that purportedly suggests that other companies are associated with MetroPCS. *See, e.g.,* D. App. 81-83 (seller on eBay advertises a "Kyocera K612 Strobe Metro PCS Camera Cell Phone" and presents a stock photo image of a Virgin Mobile-branded handset); 91-96 (seller on eBay markets a "Brown Motorola W385 –

Boost/MetroPCS cell phone"[10] that is "ready to use in Metro PCS network"); 105-07 (two listings on a "Wireless Dealer" website advertising a "Handset Verizon Metro PCS" and displaying photographs of phones that display the Verizon logo[11]). Virgin Mobile posits that these instances demonstrate actual and potential post-sale confusion occurring in the marketplace as a result of MetroPCS' reflashing. MetroPCS disputes the proposition that these listings constitute evidence of actual confusion. *See* P. 3-30-09 Reply Br. 22 ("Virgin Mobile has adduced no evidence of actual confusion.").

The court holds that a reasonable jury could not find that these listings demonstrate actual confusion as to the relationship between MetroPCS and the branded carrier. *Cf. Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 491 (5th Cir. 1992) ("The record contains evidence of instances in which both customers and employees were confused by [defendant's] use of the mark and had inquired as to whether the two companies were affiliated."); *Scott Fetzer Co.*, 381 F.3d at 487 (plaintiff submitted several affidavits recounting instances in which customers have said they thought defendant was an authorized dealer or repair shop). Assuming *arguendo* that the sale listings are themselves confusing, they

---

[10]Boost is another wireless communications provider unaffiliated with MetroPCS.

[11]Verizon is another wireless communications provider unaffiliated with MetroPCS.

still do not necessarily indicate actual confusion.  At most, the
sale listings evidence *potential* post-sale confusion.

                                E

     The next factors the court evaluates are the third and ninth:
similarity of products and the extent and nature of changes made to
plaintiff's product.  MetroPCS argues that the changes made to a
handset through MetroFLASH are *de minimis* and in keeping with the
industry practice of giving handset owners the freedom to choose
among compatible networks.  Virgin Mobile contends that MetroFLASH
radically transforms the core function of a handset, which is to
operate on a specific network, so that a reflashed Virgin Mobile-
branded handset is new product.  For the reasons explained *supra* in
§ IV(C), the court holds that there is a genuine dispute of fact
regarding this factor.

                                F

     The tenth factor is the clarity and distinctiveness of the
labeling on the altered product.  Although MetroPCS maintains that
it advises purchasers of the MetroFLASH service that their handsets
are reflashed to work on MetroPCS' network, it concedes that it
does not label reflashed handsets.  MetroPCS contends that a label
directed at downstream purchasers would serve no purpose for these
reasons: (1) MetroFLASH customers "pledge" in writing not to use
the trademark identifiers of any original wireless provider of any
unlocked handset in connection with the sale, offer for sale,

distribution, or advertising of the reflashed handset; and (2) the nature of the handset market virtually guarantees that any handset reseller will disclose to prospective buyers the service it is configured to use; otherwise, a buyer would not know whom to contact for service.   Virgin Mobile has presented evidence, however, that at least one of the MetroPCS checklists does not contain any such "pledge." D. App. 132.[12] And while the nature of the handset market may virtually guarantee that a handset reseller will disclose to prospective buyers the service the handset is configured to use, such disclosure does not guarantee that the buyer will not mistakenly believe that the service provider is affiliated with the trademark holder.

G

The eighth factor is the degree of care exercised by potential purchasers.   MetroPCS argues that handset consumers in the secondary market necessarily take care in selecting a handset that will work on a particular network, because "[a] handset purchaser who d[oes] not pay attention to network configuration and compatibility [may] end up with a device that [does] not function on his preferred network." P. 3-30-09 Reply Br. 22.  As previously noted, however, even if the typical purchaser in the secondary

---

[12]At most, under this checklist, the customer "agree[s] to remove the trademark identifiers of the original wireless provider on each Device that [he] submit[s] for flashing and authorize[s] [MetroPCS] to remove any such trademark prior to flashing each Device." D. App. 132.

market takes care to understand a handset's network configuration and is not confused about the network on which a particular handset is programmed to work, such care and understanding do not necessarily indicate a lack of confusion as to the relationship between the service provider and the trademark holder.

H

The eleventh factor is the degree to which the typical purchaser of the MetroFLASH service would attribute to Virgin Mobile any inferior qualities from reflashing.  MetroPCS contends that the typical MetroFLASH customer knows that he is signing up for MetroPCS service and therefore cannot possibly be confused about this fact.  Virgin Mobile, on the other hand, argues that where the trademark is visible and the outward appearance of the product appears identical, any downstream member of the public who may encounter a reflashed handset through personal use, perception of use by others, or subsequent purchase, is likely to believe that any changes or degradation of functionality and service are attributable to Virgin Mobile even though the actual operation of the product is properly attributed to MetroPCS.  The court holds that a reasonable jury could find in Virgin Mobile's favor regarding this digit.[13]

---

[13]Citing *Duluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093 (8th Cir. 1996), MetroPCS contends that any changes to service or functionality caused by MetroFLASH are not likely to confuse an appreciable number of reasonably prudent handset consumers.  The court holds that *Duluth News-Tribune* is distinguishable.

I

Considering all the pertinent factors in toto, the court holds that a reasonable jury could find in favor of Virgin Mobile on the issue of likelihood of confusion. Accordingly, because genuine issues of material fact exist regarding whether MetroPCS "uses" Virgin Mobile's trademark for purposes of the Lanham Act and whether its use creates a likelihood of post-sale confusion, the court denies MetroPCS' motion for summary judgment on Virgin Mobile's direct infringement counterclaim.

---------------

In *Duluth News-Tribune* there were specific numbers that demonstrated that the defendants' newspaper distribution methods ensured that the vast majority of ordinary purchasers would not be confused as to which newspaper they were buying.

> Approximately ninety-two percent of defendants' papers are sold through home subscriptions. Customers who spend the money and effort to subscribe to a newspaper are likely to know which paper they are buying, and to complain if they get the wrong one. Moreover, an additional two percent are sold through newspaper racks that clearly identify defendants as the paper's publication source. This leaves only six percent of papers sold as potential candidates for buyer confusion[.]

*Id.* at 1099. In the present case, by contrast, there are no such clear numbers in the summary judgment record. MetroPCS only contends that the number of potential customers who encounter a reflashed handset through non-owner personal use or perception of use by others is insignificant. MetroPCS also argues that, given the nature of the handset market, most consumers who purchase reflashed handsets in the secondary market are likely to know that MetroPCS supplies the wireless service. But this does not necessarily mean that the typical secondary purchaser will not be confused about the relationship between the trademark holder and MetroPCS and will not attribute any functionality problems to the trademark holder (in addition to MetroPCS).

- 30 -

VII

MetroPCS moves for summary judgment dismissing Virgin Mobile's trademark dilution counterclaim (counterclaim four), contending that it does not use any Virgin Mobile mark in commerce and that the Fifth Circuit has rejected the theory of dilution on which Virgin Mobile relies. For the reasons explained *supra* in § IV(C), the court rejects the first ground on which MetroPCS relies. The court now turns to the second ground.

A

"Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product." *Scott Fetzer Co.*, 381 F.3d at 489. Under the Lanham Act, "the owner of a famous mark that is distinctive" "shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark[.]" 15 U.S.C. § 1125(c)(1). "Blurring involves a diminution in the uniqueness or individuality of a mark because of its use on unrelated goods." *Scott Fetzer Co.*, 381 F.3d at 489. "Tarnishing occurs when a trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Id.*

- 31 -

(internal quotation marks and citations omitted).

> The dilution doctrine is concerned with
> granting protection to trademarks beyond that
> provided by the classic "likelihood of
> confusion" test. What if the respective uses
> of a mark are upon goods or services quite
> different and "unrelated" from those of
> plaintiff, such that a reasonably prudent
> buyer would *not* be likely to think that some
> connection or sponsorship existed? Under the
> likelihood of confusion test, the result is a
> judgment for defendant. There is no trademark
> infringement in the classic sense.

> However, when the likelihood of confusion
> tests is not met, the dilution theory raises
> the possibility of recovery based on an
> entirely different consumer state of mind.
> The dilution theory grants protection to
> strong, well-recognized marks even in the
> absence of a likelihood of confusion, if
> defendant's use is such as to be likely to
> diminish or dilute the strong identification
> value of the plaintiff's mark even while not
> confusing customers as to source, sponsorship,
> affiliation or connection. The underlying
> rationale of the dilution doctrine is that a
> gradual attenuation or whittling away of the
> value of a trademark, resulting from use by
> another, constitutes an invasion of the senior
> user's property right in its mark and gives
> rise to an independent commercial tort.

4 McCarthy, *supra*, § 24:72. "A given unauthorized use by defendant

can cause confusion in some people's minds and in other people's

minds cause dilution by blurring [or tarnishing], but in no one

person's mind can both perceptions occur at the same time. Either

a person thinks that the similarly branded goods or services come

from a common source (or are connected or affiliated) or not." *Id*.

"Both infringement by likelihood of confusion *and* dilution can

coexist as legal findings only if it is proven that a significant number of customers are likely to be confused *and* that among a significant number of other customers who are not confused, the defendant's use will illegally dilute by blurring or tarnishment, but one state of mind does not overlap with the other in one person." *Id.*

The court notes that there is some question whether dilution theory is even applicable between competitors such as MetroPCS and Virgin Mobile. *See Scott Fetzer Co.*, 381 F.3d at 489 (noting that blurring and tarnishing occur when the same or a similar mark is used on *unrelated goods*); 4 McCarthy, *supra*, at § 24:101 ("The Federal Act is not statutorily limited to the traditional noncompetitive setting which the concept of "dilution" [was] designed for by its creators.  But the dilution doctrine was not designed for or intended to replace the traditional likelihood of confusion test used where the goods or services are competitive or related."); 15 U.S.C. § 1125(c)(1) (trademark holder shall be entitled to an injunction against a person who dilutes its mark "*regardless of the presence or absence* of actual or likely confusion, *of competition*, or of actual economic injury." (emphasis added)).  But because MetroPCS does not raise the issue, the court will assume that dilution theory is applicable.

B

Virgin Mobile alleges that MetroPCS, through its MetroFLASH
service, has diluted the Virgin Mobile mark by both blurring and
tarnishing.    MetroPCS  contends  that  Virgin  Mobile's  dilution
counterclaim fails because it is indistinguishable from the claims
that the Fifth Circuit found to be legally invalid in *Scott Fetzer
Co.*

In *Scott Fetzer Co.* the trademark holder, Scott Fetzer, sued
independent vacuum cleaner sales and repair shop House of Vacuums
for, *inter alia*, diluting its KIRBY trademark.   Scott Fetzer
alluded to both blurring and tarnishing, but the Fifth Circuit
found "its theory of dilution [to be] essentially one of
tarnishing." *Scott Fetzer Co.*, 381 F.3d at 489.

> When  authorized  service  centers  rebuild  a
> Kirby vacuum cleaner, they use all new parts.
> House of Vacuums, however, sometimes uses used
> parts.   This practice, says Scott Fetzer,
> makes Kirby vacuum cleaners rebuilt by House
> of Vacuums inherently inferior to Kirby vacuum
> cleaners  rebuilt  by  authorized  service
> centers.    Scott  Fetzer  complains  that
> customers will link the KIRBY mark to these
> purportedly inferior products.

*Id.*   The Fifth Circuit held, however, that this theory of
tarnishing is untenable.

> Trademark law does not entitle markholders to
> control the aftermarket in marked products.
> Granted, consumers will naturally associate a
> used, repaired, or rebuilt product with the
> mark it bears . . . .   Moreover, consumers
> will often base their opinion of a product on
> the product's performance after months or

- 34 -

> years of use and periodic repairs.  These
> phenomena are necessary and unremarkable
> offshoots of a robust aftermarket in
> trademarked products, not evidence of
> dilution.  Concluding otherwise would convert
> anti-dilution laws into a tool for
> manufacturers to police independent repair
> shops and second-hand sales.  Scott Fetzer's
> theory would allow a markholder to cry
> dilution every time a resold or repaired
> product reflected poorly on the mark it bore .
> . . .  We refuse to encourage anti-dilution
> law to metastasize in this manner.

*Id.* at 490 (citation omitted).

Virgin Mobile argues that *Scott Fetzer Co.* is inapposite because, unlike the House of Vacuums, MetroPCS is not an innocent second-hand store or repair shop; its conduct does not constitute an "unremarkable offshoot[] of a robust aftermarket in trademarked products," but instead creates a different market of inferior MetroPCS products that continue to bear the Virgin Mobile trademark.

In *Scott Fetzer Co.* and in *Ty, Inc. v. Perryman*, 306 F.3d 509 (7th Cir. 2002) (a Seventh Circuit case cited by *Scott Fetzer Co.* for the proposition that trademark law does not entitle markholders to control the aftermarket), there was no dispute that the defendant was trading in the plaintiff's genuine goods and therefore that it was not a misnomer for the defendant to reference the trademark.  *See Scott Fetzer Co.*, 381 F.3d at 482 (defendant "typically repairs at least one Kirby vacuum cleaner per day and occasionally sells new and slightly used Kirby vacuum cleaners that

he has acquired from Kirby distributors or through trade-ins"); *Ty, Inc.*, 306 F.3d at 512 (defendant sells Beanie Babies, "the very product to which the trademark sought to be defended against her 'infringement' is attached"). In fact, "reference to a used or repaired item's trademark will often be the only feasible way to announce the item's availability for sale." *Scott Fetzer Co.*, 381 F.3d at 490; *Ty, Inc.*, 306 F.3d at 512 ("You can't sell a branded product without using its brand name, that is, its trademark."). Consequently, in the aftermarket of genuine trademarked goods, the two phenomena highlighted by the Fifth Circuit (i.e., the fact that consumers associate a used, repaired, or rebuilt product with the mark it bears, and that they will often base their opinion of a product on the product's performance after months or years of use and periodic repairs) naturally arise and do not constitute evidence of dilution. *See Scott Fetzer Co.*, 381 F.3d at 490. Anti-dilution law, after all, is concerned about the rising consumer search costs that will result if the distinctiveness of a trademark as a signifier is reduced. *Ty, Inc.*, 306 F.3d at 510, 511 ("The fundamental purpose of a trademark is to reduce consumer search costs by providing a concise and unequivocal identifier of the particular source of goods.") (both blurring and tarnishing "reduce[] the distinctiveness of the trademark as a signifier of the trademarked product or service," either by associating a trademark with a variety of unrelated products (blurring) or

associating the trademark with negative qualities (tarnishing),
thereby increasing consumer search costs).   Because aftermarket
sellers of used genuine trademarked products accurately reference
the trademark, and because consumer opinion of a product is often
informed by the product's performance after months or years of use
and periodic repairs, the aftermarket seller's use of the trademark
does not increase consumer search costs or reduce the signaling
power of the trademark.

    The applicability of *Scott Fetzer Co.*, therefore, essentially
turns on whether MetroPCS trades in genuine trademarked goods or
whether, by reflashing branded handsets, it creates a new product.
This is a factual issue that is in genuine dispute.   *See supra*
§ IV(C).   A reasonable jury could find that MetroPCS' MetroFLASH
service tarnishes Virgin Mobile's mark.   Accordingly, the court
denies MetroPCS' motion for summary judgment in this respect.[14]

VIII

    MetroPCS moves for summary judgment on Virgin Mobile's
contributory infringement counterclaim (counterclaim three).   It
contends that Virgin Mobile has produced no evidence, and has
failed to allege, that any MetroPCS' customers engage in direct
infringement, and that MetroPCS lacks the requisite culpability for
contributory infringement because MetroPCS' customers pledge not to

---

[14]Because the court denies summary judgment on this basis, it
need need not address whether *Scott Fetzer Co.* precludes Virgin
Mobile's dilution by blurring counterclaim.

infringe Virgin Mobile's marks.

A

Under the doctrine of contributory infringement,

> liability for trademark infringement can
> extend beyond those who actually mislabel
> goods with the mark of another.  Even if a
> manufacturer does not directly control others
> in the chain of distribution, it can be held
> responsible for their infringing activities
> under certain circumstances.  Thus, if a
> manufacturer or distributor intentionally
> induces another to infringe a trademark, or if
> it continues to supply its product to one whom
> it knows or has reason to know is engaging in
> trademark infringement, the manufacturer or
> distributor is contributorily responsible
> for any harm done as a result of the deceit.

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853-54

(1982).  "A party is liable for contributory infringement when it,

'with knowledge of the infringing activity, induces, causes or

materially contributes to infringing conduct of another.'"  *Alcatel*

*USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999)

(quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443

F.2d 1159, 1162 (2d Cir. 1971)).  Thus a finding of contributory

infringement is dependent upon the existence of an act of direct

infringement.  *See, e.g., Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d

770, 774 (Fed. Cir. 1993) ("[E]ither form of 'dependent

infringement' [active inducement or contributory infringement]

cannot occur without an act of direct infringement.").  To prevail

on its contributory infringement claim, Virgin Mobile must adduce

evidence that would permit a reasonable jury to find that someone

- 38 -

committed an act of direct infringement and that MetroPCS either
intentionally induced that person to commit the act or continued to
supply reflashed handsets to that person when it knew or had reason
to know that he was engaging in trademark infringement.

B

Virgin Mobile alleges that MetroPCS customers are using
MetroFLASH to unlawfully sell reflashed Virgin Mobile handsets.
MetroPCS contends that the evidence fails to show a direct act of
infringement by MetroFLASH customers. Because the court grants
summary judgment on another basis, it will assume *arguendo* that a
reasonable jury could find direct infringement. Virgin Mobile must
still adduce evidence that would enable a reasonable jury to find
that MetroPCS possessed the requisite culpability for contributory
infringement——i.e., that MetroPCS intentionally induced its
customers to infringe or continued to reflash handsets for
customers when it knew or had reason to know they were engaging in
trademark infringement.

Citing *Medic Alert Foundation United States, Inc. v. Corel
Corp.*, 43 F.Supp.2d 933, 939-40 (N.D. Ill. 1999), MetroPCS
maintains that it has no reason to expect that any of its customers
will commit direct infringement because its customers essentially
pledge that they will not use MetroFLASH to commit direct
infringement of any original wireless provider on any unlocked
device. *See* P. 2-3-09 App. 4 (customers "affirm that . . . they

- 39 -

will not use the trademark identifiers of any original wireless provider on any unlocked device in connection with the sale, offer for sale, distribution, or advertising of an unlocked handset[.]"); 15 U.S.C. § 1114(a) (prohibiting the use of a mark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services").  In *Medic Alert* the defendant produced a CD with clipart images.  Each CD included an "end-user license agreement that state[d], in part, that users may not use 'computer images related to identifiable individuals or entities in a manner which suggests their association with or endorsement of any product or service.'"  *Id.* at 935.  Despite this contractual term, a customer used a clipart image in a manner that allegedly infringed a trademark.  *Id.* at 935-36.  The trademark owner sued the CD maker for contributory infringement.  The *Medic Alert* court granted summary judgment, holding that the license agreement established that the defendant lacked the culpability required for contributory infringement:

> Assuming without finding that [customer's] use of the [trademark] image constitutes trademark infringement, it is not enough to hold [defendant] liable as a matter of law for contributory infringement.  In light of Corel's end-user agreement, it had no reason to expect that one of its software users would violate the contract and use one of its images for commercial use, until it was provided with actual information that someone had done so . . . . [Even after defendant was notified of customer's use of the trademark,] [e]ven then, there was no reason to think that more users would do so, again in light of its end-user

- 40 -

agreement.

*Id.* at 940.  MetroPCS therefore maintains that even if Virgin Mobile could prove that one of MetroPCS' customers directly infringed Virgin Mobile's mark, MetroPCS has absolved itself of liability by requiring its customers to pledge not to use MetroFLASH for direct trademark infringement.

Virgin Mobile counters that *Medic Alert* is distinguishable because there was nothing in that case to lead the defendant to suspect any directly infringing activity by its customer.  Virgin Mobile posits that MetroPCS, by contrast, was put on notice of its customers' infringement by Virgin Mobile's cease-and-desist letters and by the open and notorious activity of MetroPCS customers on the Internet.  Virgin Mobile also maintains that MetroPCS' customer pledges were not consistently required because at least one of the MetroPCS checklists does not contain any such pledge.  *See* D. App. 132.  According to Virgin Mobile, that form at most provides that the customer "agree[s] to remove the trademark identifiers of the original wireless provider on each Device that [he] submit[s] for flashing and authorize[s] [MetroPCS] to remove any such trademark prior to flashing each Device."  *Id.*  Virgin Mobile therefore contends that MetroPCS cannot insulate itself from a finding of contributory infringement based on customer pledges that are not consistently required and do not prevent infringing resale of Virgin Mobile handsets.

Although the record reflects a genuine fact issue regarding whether MetroPCS customer pledges were consistently required, MetroPCS is nonetheless entitled to summary judgment because this fact issue is immaterial.  To be held liable for contributory trademark infringement, MetroPCS must have either intentionally induced its MetroFLASH customers to directly infringe the original wireless provider's trademark or continued to offer its MetroFLASH service to particular customers whom it knew were committing acts of infringement.  *See Inwood Labs., Inc.*, 456 U.S. at 854–55 ("[W]hether these petitioners were liable for the pharmacists' infringing acts depended upon whether, in fact, the petitioners intentionally induced the pharmacists to mislabel generic drugs or, in fact, continued to supply cyclandelate to pharmacists whom the petitioners knew were mislabeling generic drugs."); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19 (1984) (noting that standard for contributory trademark infringement is whether defendant intentionally induced its customers to make infringing uses of plaintiff's trademarks or continued to supply its products to identified individuals known by it to be engaging in continuing infringement of plaintiff's trademarks).  *Medic Alert* does not hold otherwise.  *See Medic Alert*, 43 F.Supp.2d at 940 ("The standard is not whether [defendant] 'could reasonably anticipate' possible infringement, but rather whether it knew or had reason to know that a third party is engaging in trademark

infringement and continued to sell its products to *that third-party*.") (emphasis added)). Here, Virgin Mobile does not allege or offer any evidence that MetroPCS intentionally induced its customers to resell their branded handsets. And assuming *arguendo* that Virgin Mobile has adduced evidence that would enable a reasonable jury to infer that some MetroFLASH customers are reselling their reflashed branded handsets, Virgin Mobile has neither alleged nor presented any evidence that MetroPCS continues to reflash handsets for those particular customers whom it knows are reselling their branded handsets. At most, Virgin Mobile has proffered evidence that MetroPCS continues to offer its MetroFLASH service to the general public when it has reason to know that some past MetroFLASH customers have resold their reflashed handsets. *See, e.g.,* D. 2-23-09 Br. 43 ("MetroPCS has reason to know that customers who have handsets re-flashed via MetroFLASH are engaging in direct trademark infringement by re-selling those handsets in secondary markets."). This is insufficient of itself to meet the culpability standard under *Inwood*. *See Inwood Labs., Inc.*, 456 U.S. at 854 n.13 (The standard is *not* whether defendant "could reasonably anticipate" possible infringement.). The court accordingly grants MetroPCS' motion for summary judgment on Virgin Mobile's contributory infringement counterclaim.[15]

---

[15]MetroPCS' request for a declaratory judgment that Virgin Mobile cannot establish a claim against it for contributory trademark infringement (part of count one) is therefore moot.

IX

Virgin Mobile moves for summary judgment on MetroPCS' claim in count three, in which it seeks a declaratory judgment that Virgin Mobile's contracts are preempted by the exemption in the DMCA.[16] This exemption provides, in pertinent part:

> during the period from November 27, 2006 through October 27, 2009, the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A) shall not apply to persons who engage in noninfringing uses [of copyrighted works such as] . . . [c]omputer programs in the form of firmware that enable wireless telephone handsets to connect to a wireless telephone communication network, when circumvention is accomplished for the sole purpose of lawfully connecting to a wireless telephone communication network.

37 C.F.R. § 201.40(b)(5) (2009).

To demonstrate that Virgin Mobile's alleged contract rights are preempted by the federal Copyright Act (of which DMCA is a section), MetroPCS must show that the state-law claim (1) "falls within the subject matter of copyright," as defined by 17 U.S.C.

---

[16]MetroPCS contends that Virgin Mobile bears the burden of proof on MetroPCS' declaratory judgment claims. The court need not decide this question. Even if it assumes that Virgin Mobile has the burden of proof, it would hold, for the reasons explained, that Virgin Mobile has established beyond peradventure that Virgin Mobile's contracts are not preempted. *See, e.g., Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.,* 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (holding that to be entitled to summary judgment on matter for which it will have burden of proof at trial, party "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" (quoting *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986)).

§ 102, and (2) "protects rights that are equivalent to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. § 106." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003) (internal quotation marks and citations omitted). The test for evaluating the equivalency of rights is commonly referred to as the "extra element" test. *Id.* (citing *Alcatel USA*, 166 F.3d at 787). This test requires that if one or more qualitatively different elements are required to constitute the state-created cause of action being asserted, then the right granted under state law does not lie within the general scope of copyright, and there is no preemption. *Id.*

Here, Virgin Mobile posits that its alleged contractual rights are qualitatively different from those granted by copyright. The court agrees. Exclusive rights of federal copyright include the right to do or authorize (1) the reproduction of a copyrighted work in copies or phonorecords, (2) preparation of derivative works based upon the copyrighted work, and (3) distribution of copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership. 17 U.S.C. § 106. Virgin Mobile's tortious interference counterclaim, on the other hand, seeks to enforce its alleged contractual rights to prevent its handset purchasers from altering the hardware and software contained in the Virgin Mobile handsets and from using the Virgin Mobile handsets on another company's wireless service. These rights, established by contract,

are qualitatively different from those granted by copyright.

> Rights "equivalent to any of the exclusive
> rights within the general scope of copyright"
> are rights established *by law*—rights that
> restrict the options of persons who are
> strangers to the [copyright holder].
> Copyright law forbids duplication, public
> performance, and so on, unless the person
> wishing to copy or perform the work gets
> permission; silence means a ban on copying. A
> copyright is a right against the world.
> Contracts by contrast, generally affect only
> their parties; strangers may do as they
> please, so contracts do not create "exclusive
> rights."

*ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996); *see also Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir. 1990) ("A right is equivalent if the mere act of reproduction, distribution, or display infringes it. This action for breach of contract involves an element in addition to mere reproduction, distribution or display: the contract promise made by Taquino, therefore, it is not preempted." (citations omitted)). MetroPCS, in fact, makes no effort in its response brief to argue otherwise. The court therefore holds that MetroPCS' claim for declaratory judgment regarding preemption fails as a matter of law, and it dismisses count three of MetroPCS' complaint.

## X

The court now considers Virgin Mobile's motion for summary judgment dismissing MetroPCS' claims for declaratory judgment that it does not tortiously interfere with Virgin Mobile's contractual relations or prospective business relations (counts four and five).

- 46 -

The federal Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202, does not create a substantive cause of action. *See Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984) ("The federal Declaratory Judgment Act . . . is procedural only[.]") (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).  A declaratory judgment action is merely a vehicle that allows a party to obtain an "early adjudication of an actual controversy" arising under other substantive law.  *Collin County, Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods,* (HAVEN), 915 F.2d 167, 170 (5th Cir. 1990).  Federal courts have broad discretion to grant or refuse declaratory judgment. *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).  "Since its inception, the [DJA] has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  The DJA is "an authorization, not a command." *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962).  It gives federal courts the competence to declare rights, but it does not impose a duty to do so. *Id.*  Although "the district court's discretion is broad, it is not unfettered." *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 778 (5th Cir. 1993).  The court cannot dismiss a declaratory judgment action "'on the basis of whim or personal disinclination.'" *Id.* (quoting *Rowan Cos. v. Griffin*, 876 F.2d 26,

28-29 (5th Cir. 1989)).

Both parties acknowledge that generally "[i]t is not the purpose of the federal [DJA] to enable a prospective defendant in tort actions to obtain a declaration of non-liability." *United of Omaha Life Ins. Co. v. Region 19 Educ. Serv. Ctr.*, 2002 WL 1285204, at *3 (N.D. Tex. June 4, 2002) (Fitzwater, J.) (citing cases). "The purpose of the [DJA] is not the declaration of non-liability for past conduct, but to settle actual controversies before they ripen into violations of law or breach of some contractual duty and to prevent the accrual of avoidable damages to those uncertain of rights." *Id.* (citing cases). The principal justification for the general rule that a prospective tort defendant may not obtain a declaration of nonliability is that it would be a perversion of the DJA to compel potential personal injury plaintiffs to litigate their claims at a time and in a forum chosen by the apparent tortfeasor. *See Certain Underwriters at Lloyd's, London v. A & D Interests, Inc.*, 197 F.Supp.2d 741, 750 (S.D. Tex. 2002) (citing *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1167 (7th Cir. 1969)).

MetroPCS posits that while its declaratory judgment claims lie in tort, it should be able to pursue them because it is seeking declaratory relief regarding past and future conduct.  Virgin Mobile counters that, regardless whether the conduct is past or future, the DJA cannot be used to obtain a declaration of

nonliability in tort actions.

The court concludes in its discretion that MetroPCS' declaratory judgment claims should be dismissed, and that the issues they present should be litigated in the context of Virgin Mobile's counterclaims one and two. Although MetroPCS may in part be seeking declaratory relief regarding future conduct, it is doing so only after having been accused of committing torts and continuing to engage in conduct that is allegedly tortious. In large measure it is not seeking to settle an actual controversy before it ripens into a violation of the law, but to obtain a judgment that will substantially involve a declaration that past conduct was not tortious. The controversy has a prospective component because MetroPCS is continuing to engage in conduct that Virgin Mobile contends is tortious, not because MetroPCS is seeking relief that would enable it to settle an actual controversy before it ripens into a violation of the law. The controversy between these parties has already ripened and is full blown.

Accordingly, the court dismisses counts four and five of MetroPCS' claims against Virgin Mobile.

XI

Virgin Mobile moves for summary judgment on its counterclaim for tortious interference with existing contracts (counterclaim one).

A

The parties agree that Texas law governs Virgin Mobile's tortious interference counterclaim. To prevail on this claim, Virgin Mobile must prove by a preponderance of the evidence each of the following elements: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that such interference proximately caused injury; and (4) that actual damage or loss occurred. *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 489 (5th Cir. 2008). Because Virgin Mobile will have the burden of proof on this counterclaim at trial, to prevail on summary judgment, it must establish beyond peradventure each of these essential elements.

B

The first element that Virgin Mobile must establish is the existence of a contract that prohibits the handset owner from having his handset reflashed by MetroPCS. Virgin Mobile alleges that the terms and conditions found on the outside of its handset packaging and the terms of service found within the packaging constitute an enforceable contract, subjecting the Virgin Mobile-branded handset to certain restrictions, including that the customer may not alter any hardware or software in the phone, and that the customer may use the phone only on the Virgin Mobile service. MetroPCS counters that, even if the terms and conditions found on Virgin Mobile's packaging constitute a valid contract,

Virgin Mobile has nonetheless failed to adduce any evidence to show that any MetroFLASH customer acquired his Virgin Mobile handset in a transaction involving Virgin Mobile's box-top or shrinkwrap language, rather than in a secondary market transaction where privity would be lacking between the customer and Virgin Mobile. Virgin Mobile posits that such evidence is unnecessary because the initial owner of a Virgin Mobile handset necessarily acquires the handset subject to the contract restrictions located on and inside product packaging, and should a subsequent party later acquire the handset (e.g., by gift or second-hand sale), that party would likewise be subject to the same restrictions because the initial owner cannot grant greater rights to the handset than he actually possesses.  In other words, the parties dispute whether the mere possession of a Virgin Mobile-branded handset necessarily indicates the existence of a contract between Virgin Mobile and the possessor subject to interference by MetroPCS.

The court holds that it does not.  Virgin Mobile has cited no authority, and the court has found none, that supports the proposition that Virgin Mobile and the original handset purchaser can create, through the purchaser's acceptance of the packaging terms and conditions, restrictions that run with the handset so as to bind all subsequent owners of the handset.  Indeed, it appears that a handset, as personal property, can have no covenants that "run with" it, and that any contractual restrictions that Virgin

Mobile may place on the handset require privity with the handset owner. *See Jones v. Cooper Indus., Inc.,* 938 S.W.2d 118, 123 (Tex. App. 1996, writ denied) ("Since a patent is to be treated as personal property, there can be no covenants that 'run with' the patent.");[17] *Montgomery v. Creager*, 22 S.W.2d 463, 466 (Tex. Civ. App. 1929, no writ) ("It is true that equity recognizes a kind of covenants which do not run with land, but are nevertheless binding upon subsequent owners of property who acquire same with notice. But even that kind of covenant must relate to or concern the land or its use or enjoyment." (internal quotation marks and citation omitted)).

Virgin Mobile contends that subsequent owners of the handset who acquire it by gift or second-hand sale cannot avoid the handset restrictions because the initial owner cannot grant greater rights to the handset than he actually possesses. The principle that Virgin Mobile references——that "assignees stand in the shoes of

---

[17]Virgin Mobile contends that *Jones* is inapposite because Virgin Mobile, unlike the patent assignor in *Jones*, reserved rights in the personal good. The court disagrees. In *Jones* the patent owner sold title to the patents; "the money described as 'royalties' in the [sale agreement] was actually consideration for the assignment, and [the patent owner] retained nothing by way of his conveyance." *Jones*, 938 S.W.2d at 123. Similarly, Virgin Mobile sold title to the handsets; it did not merely license them to its customers. The use restrictions contained in the terms and conditions constituted consideration for the sale, and Virgin Mobile retained nothing by way of its conveyance. *Jones* stands for the applicable proposition that whatever obligations Virgin Mobile may have received as consideration from the original purchaser, such obligations are personal to that purchaser and do not run with the handset.

their assignors and have no greater rights"——is taken from
assignment cases, specifically one in which a liability insurer
assigned its claims against an insurance broker to a third party,
see Equitable Recovery, L.P. v. Heath Insurance Brokers of Texas,
L.P., 235 S.W.3d 376 (Tex. App. 2007, no writ), and a case in which
a book publisher assigned its contractual rights vis-à-vis the
copyright owner to a third party, see In re Law Book Co., 239 A.D.
363 (1st Dep't 1933).  Virgin Mobile offers no reason, however, why
the principles of assignment should apply to the sale of a personal
good in the secondary market.  Indeed, the cited cases suggest the
contrary.  As one case reasons, "[t]he situation of an assignee
. . . is analogous to that of a trustee in bankruptcy."  Id. at
365.  Just as a trustee stands in the shoes of the bankrupt, the
assignee stands in the shoes of the assignor.  Id.  The situation
of a purchaser of a good in the secondary market (vis-à-vis the
original purchaser and promisor), however, is different.  The
subsequent purchaser does not stand in the shoes of the original
purchaser to assume the original purchaser's place in the contract
with the promisee.  See Microsoft Corp. v. Harmony Computers &
Elecs., Inc., 846 F. Supp. 208, 214 (E.D.N.Y. 1994) (noting that
subsequent purchaser, not being party to contract, is a "complete
stranger[]" to the promisee).  Virgin Mobile cites Microsoft Corp.
for the premise that subsequent purchasers are subject to the same
restrictions as are the original purchasers.  But the Microsoft

- 53 -

*Corp.* court was careful to note that the reason for the subsequent purchasers' liability lay in copyright law, *not contract law*. The defendants in *Microsoft Corp.* purchased Microsoft products from authorized Microsoft licensees and then sold the products on a stand-alone basis, in violation of the licensing agreement between Microsoft and its licensees. In determining that the purchasers were subject to the same licensing restrictions as were the licensees, the court explained:

> [Microsoft's] claim that defendants exceeded the scope of its license agreement states a claim for copyright infringement rather than breach of contract. Not being parties to any license agreement with Microsoft, defendants are "complete strangers" to Microsoft, and their violations of the licensing restrictions must of necessity be seen as claims arising under the copyright laws rather than the law of contracts.

*Id.* Therefore, contrary to Virgin Mobile's assertions, *Microsoft Corp.* indicates that a subsequent purchaser of a Virgin Mobile-branded handset stands as a complete stranger to Virgin Mobile and is not bound by any contract that Virgin Mobile may have entered into with the original purchaser.

Similarly, *Motise v. America Online, Inc.*, 346 F.Supp.2d 563 (S.D.N.Y. 2004), cited by Virgin Mobile as applying the assignment principle in an "analogous situation," is equally unavailing. In *Motise* the court rejected the plaintiff's argument that he was not bound by the forum selection clause of the defendant Internet provider's terms of service because he was merely using his step-

father's customer account.  The court reasoned:

> Plaintiff was able to utilize the Defendant's
> service only because his step-father, Mr.
> Perretta, accepted the terms of service.  He
> was, as such, a sub-licensee of privileges
> that the Defendant conditionally granted to
> Mr. Perretta.  The Plaintiff could not,
> therefore, have greater rights than Mr.
> Perretta.

*Id.* at 566.  In other words, the *Motise* court applied the
assignment principle in a context where the original purchaser of
the Internet service entered into a contract with the Internet
service provider and then allowed a third party to use his account.
This context is analogous to an assignment because the user stands
in the shoes of the account holder to assume his place in the
contract with the service provider.  It is not, however, analogous
to a secondary-market sale, where there is a *new owner*——not merely
someone who stands in the shoes, and assumes the privity, of the
owner.  Accordingly, the reasoning of *Motise*, like the reasoning of
the assignment cases, is inapposite.

Virgin Mobile cites three cases——*Burcham v. Expedia, Inc.*,
2009 WL 586513 (E.D. Mo. Mar. 6, 2009), *Adsit Co. v. Gustin*, 874
N.E.2d 1018 (Ind. Ct. App. 2007), and *Westendorf v. Gateway 2000,
Inc.*, 2000 WL 307369 (Del. Ch. Mar. 16, 2000)——in support of its
contention that initial contracts can bind secondary purchasers
despite a lack of privity.  In two of the cases, however, the court
held that certain contractual terms were binding on the plaintiff
*because* there was privity of contract, not despite an absence of

privity.  *See Burcham,* 2009 WL 586513, at *2 (holding in case where
plaintiff booked hotel room using Expedia website that plaintiff
was bound by website's terms and conditions if "it [could] be shown
objectively that [plaintiff and defendant's] minds met and they
assented to all essential terms"); *Adsit*, 874 N.E.2d at 1023
(determining in case where plaintiffs purchased seat covers from
Internet retailer that clickwrap agreement was enforceable because
plaintiffs had reasonable notice of, and manifested assent to, the
clickwrap agreement).  And in the third case, the court held that
the plaintiff's argument that she was not a "purchaser" amounted to
"mere semantics."  *Westendorf*, 2000 WL 307369, at *4.  It reasoned
that,

> [g]iven the relationship between Gateway and
> plaintiff——plaintiff bought a Gateway computer
> in December of 1997, and received a Gateway
> computer in August 1998, which she quickly
> used and retained over thirty days——equity
> dictate[d] that plaintiff be bound by the
> arbitration clause just as someone who
> actually bought, received and retained the
> same computer is bound.

*Id*.  Moreover, in all three cases, the courts emphasized the
plaintiffs' notice of the contractual terms in holding the
plaintiffs bound to those terms.  *See Burcham*, 2009 WL 586513, at
*1 (noting Expedia's affidavit showing that plaintiff made his room
reservation by creating an account, whereby he would have had to
have clicked a button agreeing to the website's terms and
conditions after having seen the user agreement written out in full

- 56 -

text); *Adsit*, 874 N.E.2d at 1023 (holding that plaintiff was bound where "[t]o complete a transaction, a user must accept the policy, the text of which is immediately visible to the user," and the "user is required to take affirmative action by clicking on the 'I Accept' button"); *Westendorf*, 2000 WL 307369, at *2 ("Importantly, the computer [plaintiff's friend] sent to plaintiff also included Gateway's Standard Terms and Conditions Agreement . . . . [Plaintiff does not] argue that she did not receive the agreement in the shipment paid for by [her friend].").[18]  And none of the cases involved purchasers of a personal good in the secondary market.  Therefore, none of the cases supports Virgin Mobile's argument that initial contracts bind secondary purchasers despite a lack of privity.  If anything, their emphasis on the plaintiff's notice and acceptance of the contractual terms reinforces the court's determination that the mere possession of a Virgin Mobile-

---

[18]Virgin Mobile contends that the holding in *Westendorf* does not rely on the plaintiff's receipt of the applicable shrinkwrap terms along with the gifted computer, but rather on the plaintiff's knowing acceptance of the benefits of the donor's purchase and contract.  The court disagrees.  The *Westendorf* court made clear that "it [was] not patently clear to [it] that a donee beneficiary necessarily takes the donor's obligations along with his rights." *Westendorf*, 2000 WL 307369, at *4.  If all it took to bind the donee was the acceptance of the benefits of the donor's purchase and contract, then the donee would necessarily take the donor's obligations along with his rights.  Although the court's holding in *Westendorf* was not based solely on the plaintiff's receipt of the terms, the court clearly thought plaintiff's receipt was important. *See id.* at *2 ("*Importantly*, the computer . . . sent to plaintiff also included Gateway's Standard Terms and Conditions Agreement." (emphasis added)).

branded handset cannot of itself indicate the existence of a contract between Virgin Mobile and the possessor.

Accordingly, assuming *arguendo* that the terms and conditions set out on Virgin Mobile's packaging constitute a valid contract, Virgin Mobile has failed to establish beyond peradventure that a contract exists between Virgin Mobile and any particular MetroFLASH customer (i.e., evidence indicating that the MetroFLASH customer acquired her Virgin Mobile handset in a transaction involving Virgin Mobile's box-top or shrinkwrap language).

Accordingly, the court denies Virgin Mobile's motion for summary judgment on its counterclaim for tortious interference with existing contracts.

*       *       *

For the foregoing reasons, MetroPCS' February 3, 2009 motion for partial summary judgment is granted in part and denied in part. Virgin Mobile's February 23, 2009 motion for partial summary judgment is granted in part and denied in part.

**SO ORDERED.**

September 25, 2009.

SIDNEY A. FITZWATER
CHIEF JUDGE

– 58 –